1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEVEN MICHAEL TACKETT,

11                    Petitioner,                    No. CIV S-08-2636 GGH P

12        vs.

13   R.E. BARNES, et al.,

14                    Respondents.           <u>ORDER</u>

15   _____/

16   I. <u>Introduction</u>

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  On December 5, 2008, respondents consented to the

19   jurisdiction of the undersigned; on December 10, 2008, petitioner consented to the jurisdiction of

20   the undersigned.  In 2003 petitioner was convicted of two counts of gross vehicular manslaughter

21   while intoxicated (Cal. Penal Code § 191.5) (counts one and two) and felony driving under the

22   influence and causing great bodily injury (Cal. Vehicle Code § 23153(a)) (count 3).  The jury

23   also found that petitioner had committed the offense in count three with a blood alcohol level of

24   .20 percent or higher (Cal. Vehicle. Code § 23578) and by personally inflicting great bodily

25   injury (Cal. Penal Code § 12022.7).  Petitioner was also convicted of driving under the influence

26   with a blood alcohol level of .08 percent or more (Cal. Vehicle Code § 23153(b) (count four).

1    The jury also found it true that petitioner committed count four with a blood alcohol level of .20

2    percent or more (Cal. Vehicle Code § 23578) and by personally inflicting great bodily injury

3    (Cal. Penal Code § 12022.7).  The jury also found true that petitioner caused two deaths and

4    bodily injury to two additional victims pursuant to Cal. Vehicle Code § 23558.

5           Petitioner is serving a sentence of 14 years and 8 months.

6           Petitioner challenges his 2003 conviction on four grounds: 1) the admission of his

7    pre-arrest silence violated the Fifth and Fourteenth Amendments; 2) admission of the hearsay

8    statement "[t]his is your driver" violated the Sixth and Fourteenth Amendments; 3) imposition of

9    the upper term violated the Sixth and Fourteenth Amendments; and 4) the exclusion of defense

10   evidence violated petitioner's Fifth and Fourteenth Amendment rights.

11          After carefully reviewing the record, the court orders that the petition is denied.

12   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

13          The AEDPA "worked substantial changes to the law of habeas corpus,"

14   establishing more deferential standards of review to be used by a federal habeas court in

15   assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

16   Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

17          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

18   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

19   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

20   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

21   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

22   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

23   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

24   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

25          "Unreasonable application" of established law, on the other hand, applies to

26   mixed questions of law and fact, that is, the application of law to fact where there are no factually

1    on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

2    Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

3    AEDPA standard of review which directs deference to be paid to state court decisions.  While the

4    deference is not blindly automatic, "the most important point is that an *unreasonable* application

5    of federal law is different from an incorrect application of law....[A] federal habeas court may not

6    issue the writ simply because that court concludes in its independent judgment that the relevant

7    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

8    that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

9    1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

10   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

11   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

12          The state courts need not have cited to federal authority, or even have indicated

13   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

14   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

15   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

16   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

17   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

18   established Supreme Court authority reviewed must be a pronouncement on constitutional

19   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

20   binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

21          However, where the state courts have not addressed the constitutional issue in

22   dispute in any reasoned opinion, the federal court will independently review the record in

23   adjudication of that issue.  "Independent review of the record is not de novo review of the

24   constitutional issue, but rather, the only method by which we can determine whether a silent state

25   court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

26   2003).

3

III.  Factual Background

        The opinion of the California Court of Appeal contains a factual summary.  After

independently reviewing the record, the court finds this summary to be accurate and adopts it

below.

        FACTS

        In the afternoon of June 17, 2001, defendant's pickup truck went through a stop
        sign and slammed into the victims' car.

        Witnesses first saw the pickup truck being driven recklessly on Fair Oaks
        Boulevard toward California Avenue in Sacramento County. As traffic was
        waiting at a red light, the truck went at a high speed onto the gravel shoulder of
        the road, where it passed cars in the right hand lane and spun into the intersection.
        As the truck was driven away, it proceeded north on California Avenue at
        excessive speed on the wrong side of the road and through a stop sign, running at
        least one vehicle off of the road.

        The truck was next seen driving south on Marshall Avenue. At the intersection of
        Fair Oaks Boulevard and Marshall Avenue, the truck went through a stop sign at a
        speed of over 50 miles per hour and collided with a car. Stephen Ramos, the
        driver of the car, and his wife, Melissa Madison, were killed. Their son,
        Christopher Ramos, suffered great bodily injury. The occupants of the
        truck-defendant and Michael Cotham-were thrown from the truck. Each suffered
        bodily injury.

        Defendant and Cotham were both intoxicated at the time of the collision.
        Defendant's blood sample, taken about 90 minutes after the collision, showed a
        blood-alcohol level of .24 percent. Cotham's blood sample, taken about 40
        minutes after the collision, showed a blood-alcohol level of .28 percent.

        With one exception, witnesses to the events were unable to identify the driver of
        the truck that crashed into the Ramoses' car.

        The exception was Michael Delgado, who had been defendant's friend since 1994
        or 1995, and who had met Cotham once or twice. Delgado testified that on the day
        of the collision, he was with defendant and Cotham at defendant's home when the
        trio decided to go to a bar on Fair Oaks Boulevard. Defendant drove to the bar in
        his truck, with Cotham as his passenger. Delgado drove separately in his own
        vehicle. After several hours at the bar, they left, planning to return to defendant's
        house and then go to a restaurant to get something to eat. Defendant got into the
        driver's seat of his truck, and Cotham sat in the passenger's seat. Defendant and
        Cotham followed as Delgado drove onto Fair Oaks Boulevard. When Delgado
        stopped for a red light at California Avenue, defendant drove his truck on the right
        hand shoulder and spun out into the intersection. Delgado did not witness the fatal
        collision at Marshall Avenue because, after observing defendant spin his truck at
        California Avenue, Delgado drove to defendant's house.FN1

FN1. Claiming Delgado concocted his testimony, the defense did not present evidence of the usual motivations for witness perjury, such as an attempt to conceal personal involvement in the crime, antagonism between witness and defendant, a desire to protect a third party, or an effort to obtain leniency on potential or pending charges. Instead, it pointed to some inconsistencies in Delgado's various reports of the events and emphasized that (1) Delgado drank excessively and was an admitted drug addict who had used methamphetamine, cocaine, and marijuana, and (2) Delgado was likely intoxicated at the time of the collision because he spent the day drinking with defendant and Cotham. Based on evidence that Delgado's drinking and drug abuse had caused problems with his wife, from whom he was separated at the time of trial, the defense suggested that Delgado had lost everything in life and was alone. According to the defense, Delgado went to a restaurant after leaving the bar, did not witness any of the driving incidents, and made up his "story" after reading newspaper accounts of the incident "because he doesn't have anything in his life where he can feel important and be a hero...."

Soon after the collision, Harold Durham and Nicole Major stopped to offer assistance. When they approached defendant, he asked what had happened. When told that there was a bad accident, defendant repeatedly said, "What did I do?" or "I can't believe I did this." He became upset and anxious. FN2

FN2. The defense offered medical testimony that because of defendant's intoxication and the traumatic effect of the collision, including a likely concussion, he would have been confused and his comments would have been "little more than nonsensical statements."

When California Highway Patrol (CHP) Officer Robert DiMiceli arrived at the scene, defendant was on an ambulance gurney. DiMiceli or one of the medical personnel asked defendant if he was the driver. Defendant responded either "yes," "yes, sir," or something to that effect.FN3

FN3. The defense pointed out that Officer DiMiceli did not file a report on the incident and that at the preliminary hearing, he initially said he did not have a conversation with defendant (DiMiceli later clarified that he asked only the one question and did not have what he would consider a conversation with defendant). In argument, the defense suggested that DiMiceli was simply lying about the admission.

The prosecution presented the testimony of CHP experts in accident reconstruction, who explained that the physical evidence and the dynamics of the collision showed defendant was the driver of the truck that smashed into the Ramoses' car. Testifying for the defense, a retired CHP expert in accident reconstruction opined that Cotham was the driver and defendant was the passenger.

Athins Christen and Scott Manning testified for the defense. Upon arriving together at a market on the corner of Fair Oaks Boulevard and Marshall Avenue, they witnessed the collision and its aftermath. Although they could not identify defendant or Cotham from the accident, both believed that the driver of the truck was thrown out against a building and the passenger was thrown out into some

rocks. The building corresponded to the location where Cotham was found after the collision, and the rocks were by defendant's location. However, several matters cast doubt on the accuracy of their account of the incident. Christen's testimony regarding the order in which the truck's occupants were ejected was impeached by the inconsistent statement he had made to a defense investigator. When this was pointed out to him, Christen testified both occupants "pretty much flew out at the same time" and he "just kinda glanced at where they went at that time." And Christen's testimony was impeached in another respect. He said the truck became airborne when it hit the car, began to flip, and stayed airborne until the truck came down on an embankment. But the experts agreed the physical evidence showed the truck did not become airborne and did not flip. Likewise, Manning's testimony that the truck became airborne and began flipping end-to-end, doing a somersault, was impeached by expert evidence, as was his testimony that the truck never spun (the experts agreed the truck spun with a significant counterclockwise motion throughout the incident. Both witnesses acknowledged they were shocked by the incident, which happened very quickly. It thus appears that the rapidity of the incident, the shock of the witnesses and their misperception of the motion of the truck, and evidence that defendant was the driver combined to cast doubt on their testimony regarding the relative positions of the driver and passenger after the collision.

Respondent's Lodged Document 1, pp. 4-8.

IV.  <u>Discussion</u>

    A.  <u>Exclusion of Defense Evidence</u>

    Petitioner alleges that the trial court erred by excluding evidence that Cotham had engaged in driving under the influence in the past.  The California Court of Appeal denied this claim for the following reasons:

    Defendant argues the trial court erred in excluding the following evidence:

    About one year before the fatal collision, a witness reported that he and his son were almost struck by a car that had accelerated toward their street, fishtailed as it made the turn, and sped down the street. When the car stopped, the witness confronted the driver, Cotham, who was intoxicated and belligerent. Cotham ultimately was arrested regarding this incident, but was convicted only of resisting a peace officer.

    Almost one year and eight months after the fatal collision, an officer saw Cotham speeding and then spinning the tires of his car after stopping at a red light. Cotham, whose blood-alcohol level at that time was .102 to .121 percent, was arrested and convicted of DUI.

    In defendant's view, evidence of those two incidents was admissible under Evidence Code section 1103, subdivision (a)(1). (Further section references are to the Evidence Code unless otherwise specified.) We disagree.

Section 1103, subdivision (a)(1) sets forth an exception to the general rule that evidence of a person's character or trait of character, including specific instances of conduct, is not admissible to prove the person's conduct on a specified occasion. (§ 1101, subd. (a).)

As pertinent to this appeal, the statute states that "[i]n a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence" is "[o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character." (§ 1103, subd. (a)(1).)

At common law, the introduction of such character evidence was restricted to a few situations and, when admissible, was limited to evidence of reputation. (See Michelson v. United States (1948) 335 U.S. 469, 476-477, 69 S.Ct. 213, 218-219, 93 L.Ed. 168, 174.) The rule evolved that in defense of a charge, the defendant could present evidence of his or her good character. (See People v. Jones (1954) 42 Cal.2d 219, 224, 266 P.2d 38; People v. Chrisman (1901) 135 Cal. 282, 288, 67 P. 136.) If the defendant presented evidence of good character, then the prosecution could rebut with evidence of the defendant's bad character. ( People v. Hughes (1954) 123 Cal.App.2d 767, 769, 267 P.2d 376.) With respect to a victim of a crime, the common law established that where self-defense was claimed in a prosecution for a crime involving violence, evidence of the alleged victim's violent and aggressive character could be introduced in support of the claim of self-defense. (See People v. Lamar (1906) 148 Cal. 564, 572-573, 83 P. 993.) FN4

FN4. The common law also allowed the defendant in a prosecution for rape or other sex crimes to support a claim of consent-or in some jurisdictions a claim that the victim was lying-by introducing evidence of the alleged victim's promiscuity. ( People v. Shea (1899) 125 Cal. 151, 152-153, 57 P. 885; see 3 Jones on Evidence (7th ed.1998) § 16:60, p. 238; 1 McCormick on Evidence (6th ed.2006) § 193, pp. 775-781.) Now, however, all states prohibit or severely restrict the admissibility of propensity evidence with respect to the alleged victim of a sex crime. (See 3 Jones on Evidence, supra, § 16.60, p. 238.) In California, sections 782 and 1103, subdivision (c) restrict the use of such evidence.

When the Evidence Code was proposed in 1965, sections 1102 and 1103 were included to codify the limited circumstances in which character evidence could be introduced at common law. With respect to section 1103, the Law Revision Commission cited authorities reflecting that evidence of a victim's character for violence could be admitted in a trial for a crime of violence where self-defense is claimed. The Commission said that section 1103 was a codification of this existing law. (Cal. Law Revision Com. com., Deering's Ann. Evid.Code (2004 ed.) foll. § 1102, p. 357.)

In this case, defendant did not seek to introduce evidence of an alleged victim's character in order to support a claim of consent, self-defense, or any other theory of justification or excuse. He wanted to use it to show that the alleged victim of a traffic collision caused by an intoxicated driver was in fact the perpetrator of the crime. However, character evidence is not admissible to support such a claim of third party culpability. ( People v. Davis, supra, 10 Cal.4th at p. 501, 41

Cal.Rptr.2d 826, 896 P.2d 119; People v. Farmer (1989) 47 Cal.3d 888, 921, 254 Cal.Rptr. 508, 765 P.2d 940, disapproved on another ground in People v. Waidla (2000) 22 Cal.4th 690, 724, fn. 6, 94 Cal.Rptr.2d 396, 996 P.2d 46; see also Annot., Third-Party Similar Crimes (1994) 22 A.L.R.5th, p. 237, § 61.)

Nevertheless, defendant contends that because he was charged with felony DUI by causing bodily injuries to both Cotham and Christopher Ramos (Veh.Code, § 23153, subds.(a) & (b)), Cotham was a "victim of the crime" and section 1103, subdivision (a)(1) broadly permits the introduction of character evidence whenever it relates to the victim of a charged crime. We are not persuaded.

The word "victim" is not a word of fixed meaning; it may be used in many ways to refer to many different persons or entities. Often, but not invariably, the Legislature has provided a definition of the word when it is used in a statutory scheme. (See, e.g., Pen.Code, §§ 136, subd. (3); 679.01, subd. (b); 1191.10; 11158; Gov.Code, § 13951, subd. (g).) The basic notion of a victim of a crime is the person who was the object of the crime-the person against whom the crime was committed. ( People v. Birkett (1999) 21 Cal.4th 226, 232, 87 Cal.Rptr.2d 205, 980 P.2d 912.) However, this meaning can be limited or expansive depending upon the purpose of the statutory scheme in which it is used. ( People v. Crow (1993) 6 Cal.4th 952, 957-960, 26 Cal.Rptr.2d 1, 864 P.2d 80; People v. Broussard (1993) 5 Cal.4th 1067, 1071-1077, 22 Cal.Rptr.2d 278, 856 P.2d 1134.) FN5

FN5. The range of meaning, from extremely narrow to rather broad, that is given to the word "victim" in varying circumstances is amply demonstrated by the authorities collected in 44 Words and Phrases (2006 supp.), pages 247-272.

 We conclude that in enacting section 1103, subdivision (a)(1), the Legislature did not employ the word "victim" in the broad sense of anyone who could be said to have been injured by the defendant's conduct; instead, it intended to use the word in the limited sense of a person at whom the defendant's conduct was directed and whose own conduct could serve to explain, justify, or excuse the defendant's conduct toward that person. This was the existing common law when the Evidence Code was adopted and, as explained by the Law Revision Commission, section 1103 was intended to codify the existing law. (See People v. Martinez (2000) 22 Cal.4th 106, 129, 91 Cal.Rptr.2d 687, 990 P.2d 563 [when the Legislature enacts a measure as proposed by the Law Revision Commission, the Commission's explanatory comments "are persuasive evidence of the Legislature's intent"]; Brian W. v. Superior Court (1978) 20 Cal.3d 618, 623, 143 Cal.Rptr. 717, 574 P.2d 788.)

Indeed, a broader interpretation of "victim" for purposes of section 1103, subdivision (a)(1) would lead to anomalous results. For example, character evidence is not admissible to support a claim of third party culpability. ( People v. Davis, supra, 10 Cal.4th at p. 501, 41 Cal.Rptr.2d 826, 896 P.2d 119.) However, defendant's expansive reading of section 1103, subdivision (a)(1) would permit such character evidence based upon the fortuitous circumstance that the allegedly culpable third party suffered injury. This is a distinction without relevance for the purpose of a third party culpability claim.

8

Defendant's interpretation of the statute also would lead to absurdity. For example, because Cotham and Christopher Ramos suffered bodily injury as a result of the collision, defendant was charged in counts three and four with felony DUI and felony driving with a blood-alcohol level over .08 percent (Veh.Code, § 23153, subds.(a) & (b)). However, it would have been sufficient to allege only that Christopher Ramos suffered bodily injury. Thus, under defendant's construction of section 1103, subdivision (a)(1), the admissibility of the Cotham character evidence would turn on whether the charging document identified Cotham as having suffered injury. The law cannot be so absurd.

And in a case where evidence of a person's character is not offered to explain, justify, or excuse the defendant's conduct toward that person, it would be absurd to allow the defendant to take the position that the person was a victim of the crime so the defendant could introduce evidence of the person's character in order to establish that the person was not a victim of the crime, but instead was the perpetrator.

In addition, the definition of "victim" that defendant urges us to adopt would result in an expansive and amorphous concept of admissibility of character evidence. In a crime of violence where self-defense is claimed, the victim's pertinent character trait is obvious and limited-his or her violent and aggressive behavior. In other instances, the allegedly pertinent character traits would be neither as obvious nor as limited. In this case, for example, the operator of the truck drove while intoxicated, in disregard of the rules of the road, in a careless and reckless manner, and without regard to the rights and safety of other persons and their property. Under defendant's theory of admissibility, any prior or subsequent conduct that reflected on any of those matters would be admissible with respect to anyone identified in the charging document as having been injured in the collision, even if the conduct did not involve driving. Such an interpretation of the statute does not make sense.

We conclude, consistent with comments of the Law Revision Commission, that section 1103, subdivision (a)(1) was a codification, rather than an expansion, of then-existing law. Thus, a victim for purposes of the statute is a person at whom the defendant's conduct was directed and whose own conduct could serve to explain, justify, or excuse the defendant's conduct toward that person.

Accordingly, the trial court wisely rejected what it correctly noted was defendant's "new and novel theory" that evidence of Cotham's character was admissible to show third party culpability.FN6

FN6. In a parting effort to convince us that evidence of Cotham's character was admissible pursuant to section 1103, defendant asserts that he was attempting to offer the evidence to explain his behavior. Not so. The driver's reckless conduct placed Cotham, defendant, the occupants of the other car, and a number of spectators in a zone of danger. However, the conduct was not directed toward anyone in particular. The conduct of a person in the zone of danger would not explain the driver's conduct except, perhaps, to the extent the passenger was encouraging the driver, which would not be exculpatory. This was simply a case of alleged third party culpability, with the fortuitous happenstance that the allegedly culpable third party was one of the persons injured in the incident.

II

We also reject defendant's contention that the evidence of Cotham's character was admissible pursuant to section 1101, subdivision (b).

Section 1101, subdivision (b) is another exception to the general rule that evidence of a person's character or trait of character is not admissible to prove the person's conduct on a specified occasion. (§ 1101, subd. (a).) Under this exception, evidence of a person's conduct is admissible for a purpose other than to prove the person's disposition to commit such an act, i.e., it may be introduced to prove such things as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented." (§ 1101, subd. (b).)

Here, defendant claims evidence of Cotham's driving in the two incidents summarized above was admissible under section 1101, subdivision (b) to prove Cotham's "identity" as the driver who caused the fatal collision with the Ramoses' car, and to show Cotham's "common plan" of "reckless and drunken driving." We are not persuaded.

In order for evidence of a specific instance of a person's conduct to be admissible as proof of that person's identity as the perpetrator of similar conduct on a different occasion, the two instances of conduct "must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]." ( People v. Ewoldt (1994) 7 Cal.4th 380, 403, 27 Cal.Rptr.2d 646, 867 P.2d 757.) This requires that the instances of conduct have sufficient characteristics in common which are sufficiently distinctive as to set them apart from other instances of similar conduct. ( People v. Rivera (1985) 41 Cal.3d 388, 392, 221 Cal.Rptr. 562, 710 P.2d 362.)

We agree with the trial court that evidence of Cotham's driving on occasions prior to and after the fatal collision in this case was not admissible to prove the identity of the driver who caused the collision.

Driving under the influence of alcohol and reckless driving are, unfortunately, common occurrences. (See, e.g., People v. Ochoa (1993) 6 Cal.4th 1199, 1202-1203, 26 Cal.Rptr.2d 23, 864 P.2d 103; People v. Bennett (1991) 54 Cal.3d 1032, 1034-1035, 2 Cal.Rptr.2d 8, 819 P.2d 849; People v. Watson (1981) 30 Cal.3d 290, 293-294, 179 Cal.Rptr. 43, 637 P.2d 279; People v. Arndt (1999) 76 Cal.App.4th 387, 392, 90 Cal.Rptr.2d 415; People v. Valenzuela (1995) 40 Cal.App.4th 358, 360, 46 Cal.Rptr.2d 715; People v. Minor (1994) 28 Cal.App.4th 431, 433, 33 Cal.Rptr.2d 641; People v. Hansen (1992) 10 Cal.App.4th 1065, 1068-1069, 12 Cal.Rptr.2d 884; People v. Von Staden (1987) 195 Cal.App.3d 1423, 1425-1426, 241 Cal.Rptr. 523; People v. Oyaas (1985) 173 Cal.App.3d 663, 666-667, 219 Cal.Rptr. 243.) Thus, Cotham's prior and subsequent conduct was not unique and distinctive. Sad to say, but even the substantially more egregious behavior that led to the fatal collision in this case was not unique or distinctive. (See People v. Watson, supra, 30 Cal.3d at pp.

293-294, 179 Cal.Rptr. 43, 637 P.2d 279; <u>People v. Arndt</u>, <u>supra</u>, 76 Cal.App.4th at p. 392, 90 Cal.Rptr.2d 415; <u>People v. Valenzuela</u>, <u>supra</u>, 40 Cal.App.4th at p. 360, 46 Cal.Rptr.2d 715.)

In other words, the pattern and characteristics of the acts were not so unusual and distinctive to be like a signature. Nor can it be said that the acts were sufficiently similar to make them admissible under section 1101, subdivision (b). Cotham was alone in the prior incident. Although he drove at a speed that was excessive for the residential nature of the street, there is no evidence that he drove at the highly excessive speed at which defendant's truck was driven before the fatal collision. Cotham did not run through red lights and stop signs on a busy thoroughfare. In fact, he stopped after fishtailing his vehicle, rather than proceed on as did the driver of the truck after spinning out in an intersection. And, of course, there was no collision.

Defendant notes that the prior incident occurred on the Thursday before Father's Day, while the collision involved here occurred on Father's Day, albeit a year later. This gave them an "eerie resemblance," according to defendant. At trial, he tried to infuse meaning into the timing of the incidents by reference to an occasion in 1991 in which, after a verbal confrontation, Cotham assaulted his father. However, at various times, Cotham assaulted his mother, police officers, and numerous other people. Cotham's extensive history of criminal behavior dispels any notion that his misbehavior centers around his father or Father's Day.

Contrary to defendant's claim, no distinctive similarity was created by the fact that before the prior incident, Cotham had been drinking at Johnny's Bar, which was the same bar where he, defendant, and Delgado were drinking before the fatal collision, and that on each occasion Cotham left the bar in the "mid-to late afternoon." This was not unusual because both Cotham and defendant lived in the vicinity of Johnny's Bar and often went there.

Defendant views the prior incident and the fatal collision as being substantially similar because Cotham was, in the words of defendant's appellate counsel, "profoundly intoxicated" on both occasions. This overstates the record. It is true that a witness to the prior incident stated Cotham was intoxicated. But there is no evidence that he was profoundly intoxicated.

Defendant claims a distinctive similarity exists due to the fact that Cotham's driver's license was suspended at the time of each incident. But Cotham admitted that he regularly drove with a suspended or revoked license, which is common behavior by persons of Cotham's character.

Considered together, the alleged similarities between Cotham's prior behavior and the current offense are not sufficiently unique or distinctive as to imprint Cotham's " 'signature' " on both. ( <u>People v. Rivera</u>, <u>supra</u>, 41 Cal.3d at p. 393, 221 Cal.Rptr. 562, 710 P.2d 362.) Hence, evidence of the prior incident was not admissible to prove identity. ( <u>Ibid.</u>)

The subsequent incident also was not admissible to prove the identity of the driver who caused the fatal collision. In the later event, Cotham was observed driving at an excessive speed. After stopping for a red light, he spun his tires when the light

changed to green. He had an unlawful, but not profound, level of alcohol in his bloodstream. There was nothing unique about that incident and nothing similar to the fatal collision in this case.

 We also reject the claim that Cotham's prior and subsequent acts of driving under the influence of alcohol were admissible to establish a common plan.

To be admissible to establish a common plan, evidence of other conduct "must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " ( People v. Ewoldt, supra, 7 Cal.4th at p. 402, 27 Cal.Rptr.2d 646, 867 P.2d 757.) It must show the existence of a plan, rather than a series of similar, spontaneous acts. ( Id. at p. 403, 27 Cal.Rptr.2d 646, 867 P.2d 757; see People v. Sam (1969) 71 Cal.2d 194, 205, 77 Cal.Rptr. 804, 454 P.2d 700; People v. Scheer (1998) 68 Cal.App.4th 1009, 1021, 80 Cal.Rptr.2d 676.)

Experience has shown that people ordinarily do not drive under the influence of alcohol as a result of a common plan or scheme. Rather, the act is a spontaneous failure to conform one's conduct to the requirements of the law and needs of public safety. Evidence of multiple incidents of DUI may reflect a disposition to commit such acts, but it does not demonstrate a common plan or scheme of which each incident is an individual manifestation. Thus, we agree with the trial court that the evidence was not admissible to establish a common plan. ( People v. Scheer, supra, 68 Cal.App.4th at p. 1021, 80 Cal.Rptr.2d 676.)

Respondent's Lodged Document 1, pp. 8-19.

Petitioner argues that the trial court's denial of his request to present evidence of Cotham's driving under the influence on other occasions violated state law as well as his right to present a defense.

A writ of habeas corpus is available under 28 U.S.C 2254(a) only on the basis of some transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is unavailable for alleged error in the interpretation or application of state law.  Middleton v. Cupp, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

The Supreme Court has reiterated the standards of review for a federal habeas

1   court. <u>Estelle v. McGuire</u>, 502 U.S. 62, 112 S. Ct. 475 (1991).  In <u>Estelle v. McGuire</u>, the

2   Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had

3   granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the

4   evidence was incorrectly admitted under state law since, "it is not the province of a federal

5   habeas court to reexamine state court determinations on state law questions."  <u>Id.</u> at 67-68, 112 S.

6   Ct. at 480.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in

7   state law."  <u>Id.</u> at 67, 112 S. Ct. at 480, citing <u>Lewis v. Jeffers</u>, 497 U.S. 764, 110 S. Ct. 3092,

8   3102 (1990), and <u>Pulley v. Harris</u>, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

9   may not grant habeas relief where the sole ground presented involves a perceived error of state

10   law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

11   Protection clauses of the Fourteenth Amendment).

12         The Supreme Court further noted that the standard of review for a federal habeas

13   court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

14   the United States (citations omitted)."  <u>Id.</u> at 68, 112 S. Ct. at 480.  The Court also stated that in

15   order for error in the state trial proceedings to reach the level of a due process violation, the error

16   had to be one involving "fundamental fairness," <u>Id.</u> at 73, 112 S. Ct. at 482, and that "we 'have

17   defined the category of infractions that violate "fundamental fairness" very narrowly.'"  <u>Id.</u> at 73,

18   112 S. Ct. at 482.  Habeas review does not lie in a claim that the state court erroneously allowed

19   or excluded particular evidence according to state evidentiary rules.  <u>Jammal v. Van de Kamp</u>,

20   926 F.2d 918, 919 (9th Cir. 1991).

21         For the reasons stated by the California Court of Appeal, the court finds that the

22   trial court's denial of petitioner's request to present evidence regarding Cotham's previous

23   episodes of driving under the influence did not violate state law.  Accordingly, the denial of

24   petitioner's request to present this evidence did not violate fundamental fairness.

25         Due process includes a criminal defendant's right to "a meaningful opportunity to

26   present a complete defense."  <u>Crane v. Kentucky</u>, 476 U.S. 683, 690, 106 S.Ct. 2142 (1986)

1  (citation and internal quotations omitted).  Evidence rules violate this right if they "infring[e]

2  upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they

3  are designed to serve."  Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727 (2006)

4  (citation and internal quotations omitted).  Nevertheless, trial judges have " 'wide latitude' to

5  exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of

6  'harassment, prejudice, [or] confusion of the issues.' "  Crane, 476 U.S. at 689-90, (quoting

7  Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431 (1986)).

8          Evidence of potential third-party culpability must be admitted when, under the

9  "facts and circumstances" of the individual case, its exclusion would deprive the defendant of a

10  fair trial.  Chambers v. Mississippi, 410 U.S. 284, 303, 93 S.Ct. 1038 (1973). The Ninth Circuit

11  has determined that where the proffered evidence simply affords a possible ground of suspicion

12  pointing to a third party and does not directly connect that person with the actual commission of

13  the offense, that evidence may be excluded.  See People of Territory of Guam v. Ignacio, 10 F.3d

14  608, 615 (9th Cir.1993) (citing Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir.1983)).

15          Evidence that Cotham had previously driven while intoxicated did not directly

16  connect him with the accident.  Rather, at best, it simply afforded a grounds of suspicion for

17  pointing to him as the driver.  The court agrees with respondent's statement that this evidence

18  was of "extremely low probative value, and required monumental inferential leaps and gross

19  speculation in order to have any relationship to the disputed issue of who was driving the

20  pickup."  Answer, p. 25: 4-6.  For these reasons, the exclusion of this evidence did not violate

21  petitioner's constitutional right to present a defense.

22          After conducting an AEDPA review, the court orders that this claim is denied.

23          B.  Pre-Arrest Silence

24          Petitioner argues that the trial court erred in admitting evidence of his pre-arrest

25  silence as evidence of guilt.  The California Court of Appeal accurately summarized the

26  background of this claim:

1

2

> Next, defendant contends the "use of [his] prearrest silence as evidence of guilt violated his Fifth Amendment privilege against self-incrimination." We find no prejudicial error.

3

4

> CHP Officer Jim Stott was lead investigator at the scene of the collision. When he left the scene, he went to the hospital to interview defendant and to determine his state of sobriety. Stott observed defendant kicking his legs and raising his arms as medical staff were treating him.

5

6

7

8

> Defendant appeared intoxicated in that his speech was really slurred and what he was saying did not make sense. When Stott had the opportunity, he asked defendant what happened. Defendant said he did not remember anything. Stott asked about the last thing defendant remembered. Defendant said he did not know or did not remember. Defendant then turned his head away from Stott and closed his eyes.

9

10

> Objecting to evidence of the fact that defendant turned his head and closed his eyes, defense counsel argued "a person always has a right to exercise their [sic] constitutional right not to speak to a law enforcement officer," and the exercise of the right cannot be used against the person.

11

12

13

> The trial court overruled the objection, concluding defendant was not in custody and the decision in <u>Miranda v. Arizona</u> (1966) 384 U.S. 436 [16 L.Ed.2d 694] (hereafter <u>Miranda</u>) was not implicated.

14   Respondent's Lodged Document 1, p. 25.

15           In <u>Doyle v. Ohio</u>, 426 U.S. 610, 96 S.Ct. 2240 (1976), the Supreme Court held

16   that a prosecutor may not impeach a defendant by referring to his post-arrest silence after

17   receiving warnings under <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602. <u>Doyle</u>, 426 U.S. at

18   619, 96 S.Ct. at 2245. The Supreme Court has held that a defendant's pre-arrest, pre- Miranda

19   silence may be used for impeachment, <u>see</u> <u>Jenkins v. Anderson</u>, 447 U.S. 231, 235, 100 S.Ct.

20   2124, 2127-28 (1980), but has not addressed whether it may be used as substantive evidence of

21   guilt. The federal circuits are split, but in the Ninth Circuit a defendant's pre-arrest, pre-Miranda

22   silence may be used both for impeachment and as substantive evidence of guilt. <u>United States v.</u>

23   <u>Oplinger</u>, 150 F.3d 1061, 1067 (9th Cir.1998).

24           The California Court of Appeal acknowledged the legal standards set forth above,

25   but concluded that the evidence should have been excluded because it lacked sufficient probative

26   evidence to show consciousness of guilt:

We need not weigh in on this issue because we conclude the evidence should have been excluded for another reason–it lacked sufficient probative value to show consciousness of guilt.

The United States Supreme Court has observed that"[i]n most circumstances silence is so ambiguous that it is of little probative force."  (United States v. Hale (1975) 422 U.S. 171, 176 [45 L.Ed.2d 99, 104.]; see also Doyle, supra, 426 U.S. at p. 617 [49 L.Ed.2d at p. 97][silence is often "insolubly ambiguous"].)  California's Supreme Court has agreed.  (People v. Simmons (1946) 28 Cal.2d 699, 715-716 [although an arrest may be one factor that induces silence, "[m]any other forms of restraint have the same effect, such as fear, physical pain, suffering, advice of counsel, admonition as to silence, warning against self-incrimination, a belief that the accused will serve his best interests by silence, or other physical or mental pressure.  A response under any of these forms of restraint may be such as will not give rise to an inference of acquiescence or guilty consciousness"].)

Here, defendant suffered significant injuries in the collision, including a probable concussion.  From the time of the collision through the next day, he periodically displayed symptoms such as combativeness, refusal of medical aid, confusion, loss of memory, inability to remember the event that led to his hospitalization, and making nonsensical statements.  Before Officer Stott attempted to question him, speaking in a slurred manner, and saying things that made no sense.  Defendant was undoubtedly under the influence of pain and/or pain medication as well as alcohol.  Before turning away from Stott, defendant twice said he did not remember anything of the collision.  Under the circumstances, defendant's conduct in turning away was insolubly ambiguous and lacked sufficient probative value to show a consciousness of guilt.  In view of the unsettled nature of the constitutional issues and the ambiguity of the circumstances, the evidence should have been excluded.  (See Grunewald v. United States (1957) 353 U.S. 391, 423-424 [1 L.Ed.2d 931, 954]; People v. Simmons, supra, 28 Cal.2d at p. 718; People v. Bracamonte (1961) 197 Cal.App.2d 385, 389-390.)

For purposes of determining prejudice, we will assume the beyond-a-reasonable-doubt standard applies.  Under that standard, we conclude the evidence was harmless.

Silence can sometimes be prejudicial when it is introduced with evidence of a factual statement or accusation that would otherwise be inadmissible but which can be introduced on the theory that the silence constituted an adoptive admission.  (See People v. Simmons, supra, 28 Cal.2d at pp. 716-719.)  Silence also may be damaging to the defense if it is inconsistent with an affirmative defense which has been developed; the theory is that if the defense is true, then defendant would have spoken up earlier.  (See U.S. v. Zanabria, supra, 74 F.3d at p. 593 [prearrest silence offered to rebut the defense of duress].)

These potentially damaging circumstances did not exist here.  In questioning defendant, Officer Stott simply asked what happened, without making a factual statement or accusation.  Defendant did not refuse to talk to Stott; instead, he twice said he could not remember anything about the collision–information that was beneficial to the defense.  The entirety of the conversation (see § 356), together with the other evidence, amply explained why defendant did not answer

1      further.  For many of the reasons that we have concluded the evidence lacked
2      probative value, we conclude it lacked prejudicial potential.  We are satisfied
beyond a reasonable doubt that the evidence that defendant turned his head and
3      closed his eyes when questioned by Stott did not contribute to the verdict.

4    Respondent's Lodged Document 1, pp. 25-29.

5          Petitioner's Fifth Amendment claim fails because there is no clearly established

6    Supreme Court authority that admission of a defendant's pre-arrest, pre-Miranda silence as

7    evidence of substantive guilt violates the Fifth Amendment.

8          Moreover, even were the court to find that admission of pre-arrest, pre-Miranda

9    silence violates the Fifth Amendment, petitioner's claim fails because the record does not

10   demonstrate that he exercised that right.  The evidence does not demonstrate that petitioner

11   refused to talk to Stott.  Officer Stott testified that he first asked petitioner "what happened."  RT

12   at 330.  Petitioner responded that he did not remember anything.  RT at 330.  Officer Stott then

13   asked petitioner what was the last thing he remembered.  RT at 330.  Petitioner answered that he

14   did not remember.  RT at 330.  After that, petitioner turned his head away from Officer Stott and

15   closed his eyes.  RT at 334.  Officer Stott could not recall if he tried to talk to petitioner further.

16   RT at 334.  Officer Stott's testimony does not indicate that petitioner decided not to talk to him.

17   Rather, Officer Stott's testimony demonstrates that petitioner told him that he did not remember

18   anything.  Assuming petitioner had a Fifth Amendment right not to answer Officer Stott's

19   questions, he did not invoke it.

20         Petitioner's challenge to the admission of Officer Stott's testimony regarding his

21   exchange with petitioner at the hospital suggests a claim for violation of Cal. Evid. Code § 352

22   on grounds that the evidence should have been excluded as more prejudicial than probative.  See

23   Cal. Evid. Code § 352.

24         Based on the reasoning of the California Court of Appeal, the court finds that the

25   evidence was not more prejudicial than probative.  The evidence that petitioner turned his head

26   away when Officer Stott attempted to question him was explained by his intoxication and

injuries.  As noted by the California Court of Appeal, petitioner did not refuse to talk to Stott, but instead told him that he did not remember.  This evidence, while not strongly probative of any particular issue, was not prejudicial in that it is very unlikely that it contributed to the verdict.  Accordingly, admission of this evidence did not violate state law.  In any event, even if more prejudicial than probative, the admission of the "closed eyes" testimony falls far short of fundamental unfairness.

After conducting an AEDPA review, the court orders that this claim is denied.

C.   Admission of "this is your driver" Statement

Petitioner argues that the trial court erred in admitting testimony of an out-of-court statement that identified him as the driver of the truck.  The California Court of Appeal denied this claim for the following reasons:

> According to defendant, the trial court erred in allowing testimony of an out-of-court statement that identified defendant as the driver of the truck.
>
> When Officer DiMiceli arrived on the scene of the collision, Officer Stott asked him to identify or locate the driver of the truck.  DeMiceli went to the location of the truck.  One of the emergency personnel handed defendant's driver's license to DeMiceli and said, "This is your driver."  DiMiceli admitted he had no idea where that information came from or even whether it was accurate or not.  He compared the driver's license with defendant, who was then on a gurney.  DiMiceli or one of the emergency personnel asked if defendant was the driver, and defendant said he was.  DiMiceli then gave the license to Stott and stated, "This is your driver."
>
> At trial, defendant made a hearsay objection to the remark made to Officer DiMiceli that, "This is your driver."  The prosecutor responded that the statement was offered for the limited purpose of explaining why DiMiceli did what he did after hearing the statement.  The trial court overruled the objection and instructed the jury that the statement was admitted for this limited purpose and not for the truth of matter asserted.  During instructions at the close of evidence, the court gave another limiting instruction. [Footnote]
>
> > [Footnote: The limiting instruction stated: "The Court permitted testimony by California Highway Patrol Officer Robert Di[M[iceli that he was handed a driver's license belonging to [defendant] and that an unidentified individual advised him that the license belonged to the driver of the blue pickup truck.  This evidence was admitted for the limited purpose of explaining what Officer DiMiceli testified that he did after receiving the license.  The Court instructed you at the time that the evidence was received that it may not be considered by you for any other purpose.  There is no evidence concerning the source of information upon which the

unidentified person relied in making the statement to Officer Di[M]iceli, and it is for you to determine whether the statement was in fact made.  The statement is not reliable evidence concerning who was driving the pickup truck.  If you find that Officer Di[M]iceli was handed [defendant's] driver's license and that someone made such a statement to him, you may not in any way rely upon such evidence as tending to show that [defendant] drove the blue GMC pickup truck."]

Defendant argues Officer DiMiceli's conduct did not require any explanation, and the evidence was not relevant for any nonhearsay purpose.

We disagree and that the evidence was wholly without relevance.  A constant theme of the defense in questioning the witnesses, in presenting its own witnesses, and in argument was that the CHP officers on the scene conducted an entirely incomplete and inadequate investigation because they assumed defendant was the driver.  Officer DiMiceli's participation in the investigation was brief.  According to his testimony, upon being asked to locate or identify the driver, DiMiceli simply went over to defendant and asked whether he was the driver.  That would leave DiMiceli open to the argument he already had assumed defendant was the driver and thus focused his attention exclusively upon defendant.  The hearsay statement made to DiMiceli would explain why his initial, in fact only, participation in the investigation was to make inquiry of defendant.  Since the conduct of DiMiceli and the other CHP officers on the scene was played into question, the statement made to DiMiceli which would serve to explain his conduct and was not hearsay when admitted for this purpose.  (People v. Duran (1976) 16 Cal.3d 282, 295; People v. Nichols (1970) 3 Cal.3d 150, 157.)

In any event, under the circumstances of this case, the evidence was not prejudicial to defendant.  At trial, Officer DiMiceli could not identify the person who made the statement and he even admitted he had no idea where the information came from or even whether it was accurate.  It is unlikely the jury would give credence to a statement by an unidentified speaker with no indication of a foundation for the statement.  Moreover, at the time of its admission, the trial court properly instructed the jury as to the limited purpose for which the statement was introduced, and the court gave a strongly worded instruction to that effect before deliberations.  (People v. Nichols, supra, 3 Cal.3d at p. 157.)

More importantly, the evidence was actually pivotal to the defense in two respects.

First, the defense position was Officer DiMiceli lied in claiming that defendant admitted he was the driver of the truck.  According to the defense, DiMiceli based his identification of defendant as the driver solely upon the hearsay statement by an unidentified person, and only later invented the claim that defendant made an admission.  Thus, if the hearsay statement had been excluded, then the claimed admission by defendant would have been the only basis before the jury upon which DiMiceli identified defendant as the driver, and hence would have had much greater significance.

Second, as defense counsel told the jury: "Sometimes cases have a theme.  In this case if there was a word that described it, a moniker, a label, a theme of this case,

19

1    the theme would be a single word: Assume." It was the theory of the defense that
2    when Officer DiMiceli told Officer Stott that defendant was the driver, Stott
     assumed this was true.  After they learned from Delgado that the truck belonged to
3    defendant, the assumption became absolute, and the investigation effectively
     ended.  Thus again, the hearsay statement to DiMiceli, which he relayed to Stott,
4    was pivotal to the defense argument.

5    Because the defense made use of the hearsay statement and reaped its benefits, the
     introduction of the statement was not prejudicial to the defense and furnishes no
6    basis for reversal of the judgment.

7    Respondent's Lodged Document 1, pp. 29-33.

8           In this claim, petitioner raises a claim alleging that the trial court violated state

9    law by admitting the hearsay evidence to explain Officer DiMiceli's actions.  As discussed

10   above, violations of state law violate due process only if they rise to the level of fundamental

11   fairness.  Estelle v. McGuire, 502 U.S. 62, 73, 112 S. Ct. 475, 482 (1991).

12          Of course, the real federal issue is one of cross-examination/confrontation, i.e., the

13   paramedic, or other emergency response person, was not subject to being examined or confronted

14   by the defendant in court.  And, the Supreme Court has become much more strict in the last

15   several years about not admitting "reliable" testimonial statements which are not subject to cross-

16   examination in court at some proceeding.  Melendez-Diaz v. Massachusetts, __U.S.__ 129 S.Ct.

17   2527 (2009); Giles v. California, __U.S.__, 128 S.Ct. 2678 (2008);  Crawford v. Washington,

18   541 U.S. 36, 124 S.Ct. 1354 (2004).   However, even if these cases could apply retroactively to

19   petitioner's situation (and they cannot), the error was indisputably immaterial.  See Rust v. Hall,

20   2009 WL 2917777 (9th Cir. 2009), applying a Brecht standard to an alleged confrontation error.

21          Based on the reasoning of the California Court of Appeal, this court finds that

22   admission of Officer DiMiceli's testimony that an unidentified emergency worker handed him

23   petitioner's driver's license and said, "This is your driver" did not violate fundamental fairness.

24   The testimony was offered to explain why Officer DiMiceli went over to petitioner.  In addition,

25   the jury was instructed that they could not rely on this testimony to find that petitioner was the

26   driver of the truck.

1    In addition, the court observes that other, reliable evidence was admitted

2    demonstrating that petitioner was the driver of the truck.  Harold Durham testified that he came

3    upon the accident scene.  RT at 136.  He testified that he spoke to a man later identified as

4    petitioner who said to him, "What did I do?  What did I do?" RT at 142.  Nicole Major testified

5    that she was with Harold Durham when he came upon the accident.  RT at 162.  She also

6    testified that petitioner stated, "What did I do?"  RT at 167.

7    Cotham testified that on the day of the accident, he rode his bike to petitioner's

8    house.  RT at 1084.  He and petitioner then went to a bar in a truck driven by petitioner.  RT at

9    1085.  At the bar, they met Mickey Delgado.  RT at 1098-90.  He had no recollection of leaving

10   the bar.  RT at 1086.

11   Michael Delgado testified that on the day of the accident, he went to petitioner's

12   house.  RT at 515.  Cotham was at petitioner's house as well.  RT at 517.  At some point, they all

13   decided to go to Johnny's bar.  RT at 517.  Delgado drove his own vehicle to the bar.  RT at 518.

14   When he left petitioner's house to go to the bar, he saw petitioner and Cotham get into

15   petitioner's truck. RT at 518.  Delgado testified that petitioner was in the driver's seat and

16   Cotham was in the passenger seat.  RT at 518.  When they left the bar, he saw petitioner and

17   Cotham get into petitioner's truck.  RT at 528.  He saw petitioner get in the driver's side and

18   Cotham get into the passenger's side.  RT at 528.

19   Finally, defendant's own admission to being the driver when questioned far

20   outweighs the probative value of the hearing statement.

21   Based on the strong evidence that petitioner was the driver of his truck at the time

22   of the accident, it is unlikely that Officer DiMiceli's testimony that an unidentified emergency

23   worker handed him petitioner's driver's license and said, "This is your driver" had an impact on

24   the verdict.  For this additional reason, admission of this testimony did not violate fundamental

25   fairness.

26   After conducting an AEDPA review, the court orders that this claim is denied.

21

D.  Imposition of Upper Term

Petitioner argues that the trial court violated his Sixth Amendment rights by sentencing him to the upper term of ten years for count one, gross vehicular manslaughter.

In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the United States Supreme Court held as a matter of constitutional law that, other than the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 520 U.S. at 490, 120 S.Ct. 2348.  In Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004), the Supreme Court held that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303, 124 S.Ct. 2531.

In People v. Black, 35 Cal.4th 1238 (2005) ("Black I"), the California Supreme Court held that California's statutory scheme providing for the imposition of an upper term sentence did not violate the constitutional principles set forth in Apprendi and Blakely.  The Black I court reasoned that the discretion afforded to a sentencing judge in choosing a lower, middle or upper term rendered the upper term under California law the "statutory maximum." Black I, 35 Cal.4th at 1257-61.

In Cunningham, supra, the United States Supreme Court held that a California judge's imposition of an upper term sentence based on facts found by the judge (other than the fact of a prior conviction) violated the constitutional principles set forth in Apprendi and Blakely. Cunningham expressly disapproved the holding and the reasoning of Black I, finding that the middle term in California's determinate sentencing law was the relevant statutory maximum for purposes of applying Blakely and Apprendi. Cunningham, 549 U.S. at 291-294, 127 S.Ct. 856.

In light of Cunningham, the Supreme Court vacated Black I and remanded the case to the California Supreme Court for further consideration.  Black v. California, 549 U.S. 1190, 127 S.Ct. 1210 (2007).  On remand, the California Supreme Court held that "so long as a

1   defendant is eligible for the upper term by virtue of facts that have been established consistently

2   with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon

3   any number of aggravating circumstances in exercising its discretion to select the appropriate

4   term by balancing aggravating and mitigating circumstances, regardless of whether the facts

5   underlying those circumstances have been found to be true by a jury." People v. Black, 41

6   Cal.4th 799, 813 (2007) (Black II).  In other words, as long as one aggravating circumstance has

7   been established in a constitutional manner, a defendant's upper term sentence withstands Sixth

8   Amendment challenge.

9           Relying on Black II, the Ninth Circuit recently confirmed that, under California

10  law, only one aggravating factor is necessary to authorize an upper term sentence.  Butler v.

11  Curry, 528 F.3d 624, 641-43 (9th Cir.), cert. denied, --- U.S. ----, 129 S.Ct. 767 (2008).

12          In the instant case, the trial court imposed the upper term based on the following

13  factors: 1) petitioner's exhibition of extreme callousness in committing the offense; 2)

14  petitioner's criminal record which included a previous conviction for driving under the influence

15  and for driving on a suspended license; 3) petitioner's blood alcohol level was .24 percent; 4)

16  petitioner's infliction of great bodily harm.  RT at 1804-1805.

17          Cal. Rules of Court 4.421(b)(2), cited by the trial court in sentencing petitioner to

18  the upper term, see RT at 1805, provides that numerous convictions may justify an upper term:

19  "[t]he defendant's prior convictions as an adult or sustained petitions in juvenile delinquency

20  proceedings are numerous or of increasing seriousness."  Reliance on prior convictions as a

21  sentencing enhancing factor does not run afoul of Apprendi et al, in that such prior convictions

22  need not be proven to a jury.  Apprendi, 530 U.S. 490, 120 S.Ct. 2362-63.

23          Because petitioner's upper term sentence was based, in part, on the fact of

24  petitioner's prior convictions, the trial court did not violate petitioner's Sixth Amendment rights

25

26

1   by imposing the upper term sentence for count one.[1]  Butler, supra; Cunningham, supra.

2            After conducting the AEDPA review, the court orders that this claim is denied.[2]

3            Accordingly, IT IS HEREBY ORDERED that petitioner's application for a writ of

4   habeas corpus is denied.

5   DATED: 10/23/09

                                    /s/ Gregory G. Hollows
6
                                    _____
7   tack2636.157                    UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      [1]  Petitioner does not contend that the trial court incorrectly found that he had the prior
    convictions.

24      [2]  In his state appeal, petitioner argued that imposition of consecutive sentences for counts
25   two and three violated Apprendi, etc.  Although petitioner did not raise this claim in his federal
    petition, this court notes that the Supreme Court has held that neither Cunningham, nor its
    foundational cases, apply to consecutive sentencing for multiple offenses.  Oregon v. Ice,
26   __U.S.__, 129 S.Ct. 711 (2009).